[Cite as *Jutte Elec., Ltd. v. Ohio Facilities Constr. Comm.*, 2016-Ohio-8580.]

| | |
|---|---|
| JUTTE ELECTRIC, LTD., et al. | Case No. 2014-00318 |
| Plaintiffs/Counter Defendants | Referee Dale A. Crawford |
| v. | <u>DECISION OF THE REFEREE</u> |
| OHIO FACILITIES CONSTRUCTION COMMISSION | |
| Defendant/Counter Plaintiff/Third-Party Plaintiff | |
| v. | |
| STEED HAMMOND PAUL, INC., etc. | |
| Third-Party Defendant/Fourth Party Plaintiff | |
| v. | |
| BERARDI PARTNERS, INC. | |
| Fourth-Party Defendant | |

{¶1} This matter comes to be heard on a trial to the Court held on August 1-11, 2016. Post trial briefs and replies have been submitted. The action involves a December 20, 2010 contract entered into between Ohio School Facilities Commission (OSFC) as the "Owner" and Jutte Electric, Ltd. (Jutte), the electrical contractor (Ex. 11, 12, 13); TransAmerica Building Company, Inc. (TransAmerica), the general trades contractor; Vaughn Industries, LLC (Vaughn), the mechanical and plumbing contractor; Hall Aluminum Products, the exterior doors and windows contractor; TP Mechanical Contractors, Inc., the fire protection contractor; Bovis Lend Lease, Inc. (Lend Lease), the project construction manager; and, SHP Design (SHP), the lead architect for the

project. (Ex. A).  SHP contracted with Berardi + Partners, Inc. (Berardi) to do design work and to prepare the finalized construction drawing.  (Ex. SHP, E & D).

{¶2} The entire project was a campus wide construction of academic and dormitory buildings for the Ohio School for the Deaf and Blind.  Due to some political and funding issues, it was decided that the project would be separated into two components; the dormitories and the academic buildings.  It was decided that the dormitory contract would go first.  The contract budget for the dormitories project was $6,712,626 with the electrical portion being $786,892 with Jutte as the low bidder.  The original contract was for sixteen dorms, eight on each side.  The number of buildings was later changed to six on each side, a change that was anticipated in the bidding process.  The buildings were residential buildings made of wood framing.  One model was to be constructed for high school students, one model for middle and elementary students.

{¶3} The Court agrees with Jutte's counsel, and most witnesses, that the project was a mess from beginning to the end.  It was poorly planned, poorly scheduled, poorly administered, and the Court will add, the contractors poorly performed.  Plaintiffs, Jutte and Southwest Marine and General Insurance Company (Surety) claim that because of numerous problems encountered on the project attributed to the OSFC that they incurred an uncompensated loss of $940,130.29.  Shortly after the project commenced in the spring of 2011, Jutte had significant financial difficulties and was unable to complete the job.  Jutte filed for bankruptcy in June 2011.  The Surety on Jutte's bid came onto the project and in August 2011 agreed to complete the project by funding Jutte to complete the work on the bid.  The Surety claims that by funding Jutte to complete the project it steps into the shoes of Jutte and has standing as a plaintiff and is entitled to recover alleged loss incurred by Jutte.

{¶4} OSFC has denied it did anything wrong that proximately caused Jutte and/or the Surety any damage.  In addition, OSFC filed a third party claim against SHP alleging

that if OSFC is liable to Jutte and/or the Surety for breach of contract or negligence on behalf of SHP or its contractors, then SHP is liable to OSFC for the damages incurred. SHP, in turn, has filed its third-party claim against its contractor, Berardi, alleging that if it is liable to OSFC for any of the damages incurred by Jutte and/or the Surety, then Berardi is liable to SHP for the damages it incurs.

## I: Project Issues

{¶5} From the beginning the project was fraught with issues.  The original project manager for OSFC, Robert Grinch (Grinch depo, p. 60) testified there were political issues with the project with a change of governors but they decided to go forward with the dorms while they were waiting for funding for the academic buildings.  The project actually started in March 2011, months later than planned.  The project drawings which were required by R.C. 153.01 to be "full and accurate plans, suitable for the use of mechanic's and other builders * * *" were never done by Berardi.  Berardi had been paid its full contract price with SHP so it had no incentive to produce further drawings. Weather was also an issue early on in the project.  Requests for Information (RFI) were answered on the average of 13 days late.  Most of the project managers could not get along with each other which created friction, especially between Jutte, Lend Lease, TransAmerica, and SHP.  Recovery Schedules 2, 3, and 4 were not realistic and fire system ratings were changed mid project.

### TransAmerica Project Issues

{¶6} As the general trades contractor, TransAmerica was responsible for preparing the property and constructing the foundation; framing, roofing (AAA Roofing was its subcontractor); and, drywall and painting.  During the project, TransAmerica had the following problems all impacting the timing and cost of the project:

1) The work was not in sequence (Ex. 91, 81);
2) Delays in laying the slabs which in turn causes delays in framing;

3) The framing was done off-site which caused the framing to be inaccurate and delayed up to six months;

4) Roofing was delayed and at times poorly done by AAA Roofing, which caused the contractors (i.e. Jutte) to be behind in their work;

5) Not meeting recovery schedules – delaying the other contractors (Ex. 14).

6) Roofs not meeting specifications – not certified;

7) Walls not done properly caused delays in the electrical work (Ex. 282).

{¶7} As Madison Dowlen, OSFC's Project Administrator, testified, TransAmerica didn't build the building in the way that they – in the way that the project was intended. TransAmerica chose to panel these buildings and have them panelized and built off site. (Dowlen depo., p. 55). Dowlen further testified that the drawings did not cause this problem. He further testified that the walls weren't straight. (Downlen depo., p. 133). The core meeting minutes of July 21, 2011 (Ex. 184) stated that the "delays [in the project] were due to weather, framing issues and the characteristics of the buildings themselves as they are not typical houses."

{¶8} The general overall performance of TransAmerica as testified to by Dowlen (Dowlen depo., p. 194), and as set forth in Ex. 185-186, is that TransAmerica's personnel did not have the knowledge or skills to perform the job. "Their performance was poor."

{¶9} Kenneth Jutte, President of Jutte, testified as to the project issues, especially with respect to TransAmerica as follows:

"The whole job was messed up. So, I mean that's a tricky, tricky question for me. [What did the State do to cause you damage?] It started off messed up right out of the gate. It was like walking up on a train wreck. It never got really in line, as far as I am concerned."

(Jutte depo., p. 50)

* * *

"Everybody in front of us, so it's from the layout of the building to the concrete, to the dirt work, to the wood framing.  We're not supposed to be in a building until it's dried up.  That means the windows are in, the roof's on, no water's getting in.  Our stuff's not allowed to get wet."

(Jutte depo., p. 61)

{¶10} TransAmerica also had problems with its agent-architect SHP.  SHP chose to have an unlicensed architect manage the project.  SHP's subcontractor, Berardi, was routinely dilatory in delivery of a buildable design.  In fact, it never delivered one that was acceptable to TransAmerica or Lend Lease.

### Jutte Project Issues

{¶11} Ken Jutte and Jutte Electric started the project bankrupt.  Even though it officially ceased to exist as a legally recognized business entity as of December 31, 2012. (Ex. BB).  According to Ken Jutte, his company ceased to exist at the time he filed bankruptcy in June 2011 (Jutte depo., p. 9-10, 12).  Jutte testified that he couldn't maintain payroll in late 2010-2011 (Jutte depo., p. 123); there was a hold on his supplies as of June 23, 2011 (Jutte depo., p. 123); he owed his suppliers Edison Electric and Loeb a lot of money and he couldn't pay them (Jutte depo., p. 85); there was a tax lien against his property in Mercer County (Jutte depo., p. 123); as of June 23, 2011, Jutte's employees on site hadn't been paid for seven weeks (Jutte depo., 85); and, the bank had foreclosed on the shop in spring of 2011 (Jutte depo., p. 125).

{¶12} As a result of all of these issues Jutte did not have the manpower to perform its contracted job.  Ditches necessary to carry the under foundation power remained open and wet for months.  (Ex. B).  Temporary power, which Jutte was to install in March, was not completed until August – with supplemental labor provided by Accurate Electric (Accurate).

**{¶13}** It is clear to the Court that Ken Jutte was oblivious of his financial position and the contractual commitments he made on this project and the other projects he was working on. While his company was doing practically nothing on the job from the spring of 2011 to August of 2011, he denied he needed more manpower to complete the job. (*See* five-day notice, Ex. G; July 19, 2011 email, Ex. SHP HH). He originally planned on having four or six people on the two dorm sites which was clearly not enough manpower. Ken Jutte received the August 3, 2011 Notice of Termination letter (Ex. G) listing fifteen items that Jutte had not performed properly, his response was "* * * this is the same old Lend Lease story. It's hurry up and wait, and there was no need for additional manpower." (Jutte depo., p. 97). Jutte told Keith that he would bring in more manpower "just to shut Clay up." (Jutte depo., p. 80). Even after being advised orally, in emails, in the August 3, 2011 letter of termination, and by his agreement in the Memorandum of Understanding (MOU) completed in the Bankruptcy Court (Ex. 310), Jutte continued to put his head in the sand and denied his company had done anything wrong on this project and the work did not need to be supplemented by Accurate Electric. (Jutte depo., p. 207). It appears to be the position of Plaintiffs that while Jutte may not have been perfect on the job (Ben York testimony, Ken Jutte testimony, and Plaintiff's counsel closing argument), the delays and the cost overruns were the fault of others – especially Berardi and SHP for not having workable drawings; SHP and Lend Lease for not responding to RFI's on a timely basis; and OSFC and Lend Lease for not bidding the other phase of the project on a timely basis and by having unworkable recovery schedules.

**{¶14}** While the Court finds that these issues impacted the project and are mostly attributable to the OSFC, there is not sufficient evidence to prove that these issues were a cause of Plaintiff's damages. Quite the contrary. While the drawings were poor, late, and never complied with R.C. 153.01, there is no evidence that the drawings, or lack thereof, proximately causes any of Plaintiffs' damages.

{¶15} Ken Jutte testified he didn't really rely on the schedules. (Jutte depo., p. 207). Ben York testified that the electrical drawings "were workable" but they did cause additional time. Neither York, Jutte, nor Plaintiffs' expert, Timothy Calvey, ever testified as to the quantification of the time delay attributed to the drawings or schedules. Joshua Predovich, project manager for SHP, testified that while the drawings were not complete or accurate, Jutte was not affected. The posted drawings were sufficient for the work Jutte was to perform. Clay Keith testified that the trades work (TransAmerica) was out of sequence causing an impact on the electrical work (Ex. 81, 91). James Smith, site superintendent for Lend Lease, testified that Jutte was far behind on the project because of a lack of manpower and equipment. He did not believe that the lack of proper drawings had an effect on Jutte's lack of performance. Even Joshua Wilhelm, project manager for TransAmerica,[1] testified that while the drawings were not workable for TransAmerica, Jutte could follow them.

{¶16} There is no doubt that the RFI's submitted by Jutte and other contractors were not answered in a timely fashion. In general, they were delayed on the average of 13 days. Plaintiffs allege that the delays in RFI's caused it to be delayed. Ben York, Jutte's third project manager commencing in August 2012, testified that he believed Jutte was delayed because of these late responses. (Ex's. 232, 233, 234-240). Mr. York's testimony about delays attributable after he came on the project was subjective as to the delays. He believed the late RFI's caused delay but he did not attribute any particular delay to any late RFI. (See Ex. 86). Mr. York also testified that the drawings were "workable" and he attributed no delay or cost overruns to the poor drawings.

---

[1]TransAmerica filed a separate action against OFSC claiming damages for its losses on the project resulting from OSFC's breach of contract.

**II: Plaintiff's Expert Testimony**

{¶17} As a background, this case needs to be considered in two different time periods, before and after the execution of the MOU. (Ex. 310). Tim Calvey was Plaintiffs' expert. He testified and submitted a report with regard to Plaintiffs' damages. One of the major problems with Tim Calvey's report and testimony is that he does not separate these time periods. Upon the signing of the MOU, OSFC, Jutte, and the Surety agreed to move forward with Jutte completing the project (funded by the Surety). As further explained below, Jutte agreed to fix specifically enumerated problems that happened before the MOU and complete the rest of the project pursuant to the Contract. Therefore, all claims before August 31, 2011, were settled and should not have been included as damages. OSFC had its chance to include all outstanding issues in the MOU and agreed that what needed correcting was a specific number of items listed in the August 2011 5-day notice. (Ex. H).

{¶18} Mr. Calvey uses the "measured mile" approach in calculating the alleged damages suffered by Plaintiffs. This method may be appropriate in some circumstances. *See Wood Electric Inc. v. Ohio Facilities Construction Commission*, Court of Claims Case no. 2014-00987; *J&H Reinforcing & Structural Erectors, Inc. v. Ohio School Facilities Commission*, Court of Claims Case no. 2010-07644. However, it is not appropriate in all circumstances.

{¶19} In order to be an appropriate method, the work completed in different portions of the project (used by the expert for comparison purposes) must be sufficiently similar. Mr. Calvey used periods of time that were not sufficiently similar. He included the period of time prior to the MOU. This period should not have been considered because anything that happened during that time is effectively considered settled, as the project was moving forward under a new agreement between OSFC and Jutte.

{¶20} Further, Mr. Calvey made absolutely no effort to distinguish the causes of delays and cost overruns on the project. In fact, he took the position that Jutte was not

responsible for any of the delays throughout the duration of the project. As to the time leading up to the August 2011 5-day notice, he testified that Jutte's actions did not lead to cost overruns. This is clearly contrary to the facts, as OSFC was forced to bring in additional manpower to supplement Jutte's work. The Court does not find Mr. Calvey's testimony regarding Jutte's lack of impact on delays to be credible. Ben York, Jutte's on-site supervisor, admitted that Jutte was not perfect on the site. He felt that other contractors were also at fault for delays. Clearly, Mr. York is more credible regarding Jutte's impact.

{¶21} The Court finds that Jutte's improper handling of the project is inextricably connected to problems caused by other contractors. The differentiation of delays attributable to particular parties is an integral part of the causation analysis and Mr. Calvey completely ignored it. The fact that the damage calculation does not attribute anything to Jutte's own failings is highly suspect and realistically improbable. It leads the Court to doubt the validity of Mr. Calvey's findings.

{¶22} "A party seeking damages for breach of contract must present sufficient evidence to show entitlement to damages in an amount which can be ascertained with reasonable certainty." *Tri-State Asphalt Corp. v. Ohio Dept. of Transp.,* 10th Dist. Franklin No. 94API07-986, 1995 Ohio App. LEXIS 1554 (Apr. 11, 1995), citing *Kinetico, Inc. v. Independent Ohio Nail Co.,* 19 Ohio App.3d 26, 30 (8th Dist.1984). "Contract damages must be shown with certainty and not left to speculation." *Father's House Int'l, Inc. v. Kurguz,* 10th Dist. Franklin No. 15AP-1046, 2016-Ohio-5945, citing *Samson Sales v. Honeywell, Inc.,* 8th Dist. Cuyahoga No. 51139, 1986 Ohio App. LEXIS 9341 (Dec. 18, 1986). In general, compensatory damages must be shown with certainty, and damages that are merely speculative will not give rise to recovery. "Although lost profits need not be proven with mathematical precision, the evidence and theory of the case must provide the finder of fact with known, reliable factors that can guide the computation of damages." *RAE Assocs. v. Nexus Communs., Inc.,* 2015-Ohio-2166, 36

N.E.3d 757 (10th Dist.).   The evidence in this case is lacking such known, reliable factors.

{¶23} Plaintiffs have failed to prove by a reasonably degree of certainty that OSFC, as opposed to another contractor or their own conduct, proximately caused their damages.  With no evidence attributing damages to particular parties, the Court is left to speculate.

### III: Surety and its Investigation

{¶24} Based upon Ken Jutte's testimony, Jutte Electric was bankrupt when it started the project in the spring of 2011.  When it bid on the project in October 2010, it filed a performance bond in the amount of its bid, $786,892.  The bond was written by Southwest Marine and General Insurance Company.  The Surety's bond is set forth in Ex. 309.  The Surety was notified of Jutte's lack of performance and possible default on the project sometime in June 2011.   Counsel for the Surety, Anne Meyers was responsible for investigating the claim and reporting her findings to the Surety so that it could make a decision regarding how it wished to proceed on the claim.  She worked with Contractors Operation Planning (COP) to investigate the Surety's option on the performance bond.  Raymond Zetts was the senior claims adjuster employed by COP to work with Anne Meyers in choosing its method of proceeding.

{¶25} A surety has several options available to it when facing the possible default of the contractor for which it issued the performance bond.  Since the main purpose of performance bonds is to assure owners that they will receive the performance that they bargained for, courts interpreting the common-law rights of sureties have acknowledged the rights of sureties to choose their means and methods so long as the owner is made whole.  *See 4 Bruner & O'Conner on Construction Law* § 12:77.  "Performance bond protects the [oblige/owner] by making sure that it is not left with a partially completed project * * *."  *Trinity Universal Ins. v. United States*, 382 F.2d 317 (5th Cir.1967).  Another important function of performance bonds is to "assure that the government has

a completed project for the agreed contract price." *Id.* Sureties have a common law right to choose to either complete performance or finance the obligee's completion. *Aetna Cas. & Sur. Co. v. United States*, 845 F2.d 971 (Fed. Cir. 1988). In effecting these rights, the surety "may satisfy its obligations in various ways * * * the surety may formally take over the project and contract for its completion, or it may allow the project to be defaulted and let the government complete or contract for the completion of the project, in which case the surety is responsible for reasonable costs in excess of the contract price. A performing surety may also satisfy its obligation by providing funds to an insolvent contractor to complete performance." *Id.* at 975.

{¶26} A surety's obligation to perform does not arise unless and until its principal has materially defaulted with respect to its obligations. *See L&A Contracting Company v. Southern Concrete Service, Inc.*, 17 F.3d 106 (5th Cir.1994) (holding that, "although the terms 'breach' and 'default' are sometimes used interchangeable, their meanings are distinct in construction suretyship law. Not every breach of a construction contract constitutes a default sufficient to require a surety to step in and remedy it. To constitute a default, there must be (1) material breach or series of breaches (2) of such a magnitude that the obligee is justified in terminating the contract.")

{¶27} While the parties quibbled during trial about whether or not Jutte was technically defaulted, giving rise to a situation wherein the Surety's obligations arose, the Court finds that Jutte did in fact default and the Surety's rights and obligations arose when it was made aware of Jutte's issues on the site. Even if Jutte was not technically defaulted, the parties agreed to the MOU. In the MOU, OSFC, the Surety, and Jutte agreed that the Surety would step in to provide financing so that Jutte could finish the job. Therefore, the Surety's rights and duties were supplemented by this document. What was not altered was the Surety's duty to properly investigate the claim before choosing which method to employ in order to ensure the project was completed as originally agreed to by Jutte. There is little controlling case law regarding what a

sufficient investigation should entail. However, there are a number of notable sources available to sureties which provide information to a surety regarding the scope and breadth of its inquiry.[2] At the very least, the Surety should thoroughly investigate its underwriting file, interview its principal (contractor) and review its files, and interview the owner and review any materials which demonstrate any problems on the project.

### Anne Meyers' Investigation

{¶28} Anne Meyers was ultimately responsible for ensuring a thorough investigation occurred, as the Surety relied on her recommendation in making its decision. She testified that in conducting the investigation, and prior to making her recommendation to the Surety, she did not do any of the following:

1) review the underwriting file;

2) visit the construction site;

3) personally evaluate the equipment Jutte had on site to ensure they were properly equipped to finish the job, or evaluate the qualifications of the Jutte employees;

4) see the photos of the open trenches (Ex. B);

5) hire an architect to review the project plans or a scheduling expert to evaluate the quality of the schedules.

Further, she could not recall if she did the following:

6) review Ex. 321, the email from Clay Keith to Mr. Zetts explaining that Jutte had already utilized 40% of its projected labor for the entire project by July, 2011;

7) review Ex. H, the email from Bob Beal, President of Accurate Electric, regarding Accurate's proposal to finish the job.

---

[2]*See Bond Default Manual*, Tort and Insurance Practice Section of the American Bar Association (Duncan L. Clore, 2nd ed., 1995); Bruce King, *Takeover and Completion of Bonded Contracts by the Surety* (1995); William H. Haug, *Financing Your 'Solvent' Principal – Success of Failure* (1996); *The Law of Performance Bonds,* Tort and Insurance Practice Section of the American Bar Association (1999).

{¶29} Number 7 is important, because she testified that one of the reasons she decided to recommend that the Surety hire Jutte to complete the project, as opposed to bringing on another contractor, was that it would take too long to get the other contractor up and running on the job.  However, it is clear that Accurate was ready, willing, and able to get to work.  In fact, they were already on site supplementing Jutte's work.

{¶30} It is clear that there were many aspects of the project that she was unaware of prior to her recommendation to the Surety.  In fact, she testified that there were certain things about the project that she just didn't know, because those particular things were more the responsibility of Ray Zetts.  Ultimately, as demonstrated by the afore-mentioned list, she relied heavily on the Ray Zetts' reporting on his findings of his own investigation.

### Raymond Zetts' Investigation

{¶31} Based on the testimony of Raymond Zetts, one of the first steps in his investigation involved reviewing the bid documents and obtaining completion bids from the other contractors who originally bid the job to determine if Jutte's bid was reasonable.  From this he learned that Jutte had substantially underbid the project.  Yet, he later determined, based in part on his investigation, that the Surety could possibly "beat the spread," that is, do the job for less than the next lowest bidder (Accurate Electric).  He first visited the construction site sometime in June 2011 and met separately with Ken Jutte and Clay Keith.  From his meetings he learned that there were some issues with drawings on the site and that buildings were late coming out of the ground.  He personally witnessed the open trenches left unfinished by Jutte (Ex. B).  He was not aware of the specifics related to drawing issues, i.e. that full and accurate drawings had not yet been rendered.  He was aware of some scheduling issues, but only to the extent that some of the buildings were not yet out of the ground, even though they should have been by that day.  No change to the completion date was discussed.

He was not aware of any of the dimensional issues on site related to the walls which were built incorrectly off-site. He was also not aware of any issues with RFI's. Nor was he aware of any issues related to casework – i.e. that the casework contractor had not yet been identified. According to Ken Jutte, this project had all sorts of problems from the very beginning. (Jutte depo., p. 26-27, 37, 50-51, 52, 93, and 142-143). Yet, Mr. Zetts testified that he was only aware of minor issues with drawings and a slight delay with buildings coming out of the ground. Had he thoroughly investigated, he would have been aware of the issues that plagued the project from the beginning.

{¶32} Mr. Zetts did not investigate Ben York's background to determine if he was qualified to act as the project manager on a project of this magnitude. Rather, he reviewed a short summary of his work history and relied on Ken Jutte's representation that Mr. York was his best employee for the job. Mr. Zetts was made aware of the fact that Jutte had at least 3 other active projects besides the School for the Deaf and Blind, and he expressed concerns to Ken Jutte about how that may impact Jutte's available manpower. He mistakenly relied on Mr. Jutte's promise that Jutte had additional manpower available to complete the job, a promise which never came to fruition. Further, Mr. Keith informed Mr. Zetts that as of July 2011, Jutte had already expended 1,600 hours on the job, or approximately 40% of its estimated labor for the entire job. (Ex. E). That is, he was aware in July 2011 that Ken Jutte had substantially underestimated the total manpower necessary for completion. Mr. Zetts could not recall reviewing the construction contract before he made the decision to recommend that the Surety complete the contract by funding Jutte. Mr. Zetts relied on very little information regarding Jutte's internal accounting and financials. In an email to Ken Jutte at the very beginning stages of his investigation, he asked Ken Jutte for a job cost breakdown. (Ex. 321). However, he never received any such document, save for one page detailing Jutte's preliminary estimates for bidding purposes. Mr. Zetts never reviewed any document detailing day-to-day operating expenses, and it seems that no such records

were actually maintained by Jutte. Mr. Zetts also testified that he did not recall reviewing the bankruptcy documents, in particular the summary of schedules (Ex. I) detailing Jutte's financial situation at the time of the project; however, these documents were reviewed by Anne Meyers, counsel for the Surety.

{¶33} Mr. Zetts did testify that he was fully aware of the deficiencies laid out in the five day notice (Ex. G) and that those deficiencies were incorporated into the MOU, such that the Surety would be responsible for ensuring they were rectified. According to Paragraph 1 of the MOU, "The Principal [Jutte] agrees to complete the Work in accordance with the requirements of the Contract and to correct the issues raised by Obligee [OSFC] in its 5 day notice of August 10, 2011." (Ex. 310).

{¶34} He did not review the underwriting file nor did he know anything about the underwriting process. He communicated, sparingly, with the underwriting department. He was aware of the fact that Jutte had been bonded in the past, but that was the extent of his knowledge as it relates to previously issued bonds, i.e. he did not know anything about the nature or extent of the investigations performed by the Surety prior to issuing bonds. It should also be noted that Mr. Zetts is not a licensed electrician nor has he ever served as a project manager on this type of construction project. He is also not an accountant, although he did testify that he took some accounting classes as part of his bachelor's degree. The Surety did not hire an expert (i.e. a forensic accountant, or a construction and/or scheduling expert) prior to making the decision to fund Jutte nor did it analyze the likelihood that Jutte could complete the project as bid.

{¶35} The Court finds that the investigation performed by the Surety, by way of Mr. Zetts, assisted in part by Anne Meyers, was inadequate for a project of this magnitude. In particular, the Surety was not aware of the day-to-day costs of the job to date when it came onto the project. Rather, it relied on the pre-bid estimates produced by Ken Jutte, and Mr. Jutte's assurance that the numbers were still accurate. The Surety, through Mr. Zetts, relied on Ken Jutte's assurance that Jutte had enough

manpower to finish the job as originally bid.  Ms. Meyers testified that she recognized from the beginning that Jutte's representation as to its ability to produce adequate manpower was not accurate.  The Surety again relied solely on Ken Jutte's representation that Ben York was the best Jutte employee to run the job site.  While the evidence shows that Jutte's performance dramatically increased after Mr. York took over, the Surety did not take any steps to independently verify that the project manager had the qualifications and experience to manage this type of project.  Since Ken Jutte was only on site a handful of times and Mr. Zetts was only on site frequently in the beginning stages of the Sureties involvement, the Surety placed a great deal of trust in a project manager that they knew very little about.  Further, the Court finds there was a lack of diligence by Mr. Zetts in failing to read and understand the original contract between Jutte and OSFC.  Especially, considering the fact that under the MOU (Ex. 310), he was responsible for supervising and overseeing Jutte's completion of the job.  The Surety mistakenly relied on Ken Jutte's representation that Jutte (a company which essentially existed only in name) could finish the job, pursuant to the contract, within the original bid amount.  Both Mr. Zetts and Ms. Meyers testified that they did not believe Ken Jutte when he told them Jutte could finish the job and make a profit.  They recognized and testified that the project had been underbid.  They decided not to believe this bold claim as it had no basis in reality.  However, for some reason, Mr. Zetts decided he could rely on Ken Jutte's opinion regarding Jutte's ability to supply adequate manpower and complete the job.  Ultimately, a great deal of trust was placed in the owner of Jutte Electric, even though it seems apparent to the Court that he had very little interest in ensuring that his company completed the project as it agreed to.

{¶36} "The principal disadvantage of a takeover is the loss of protection of the bond penalty.  Once the surety agrees to complete the work [or agrees to fund the principal], the surety's obligation is not measured by the bond penalty but rather by its contract with the owner/oblige to effect completion.  The surety, therefore, assumes the

risk of hidden conditions or other problems which might develop in the completion process." *The Law of Performance Bonds,* Tort and Insurance Practice Section of the American Bar Association (1999), citing *McWaters & Bartlett v. U.S*, 272 F.2d 291 (10th Cir.1959); *Caron v. Andrews*, 284 P.2d 544 (Cal. 1955); *Klein v. J.D. & J.M. Collins*, 106 So. 120 (1925). The Surety took a risk and it did not pay off. Had a proper investigation been done, the maximum loss the Surety would have incurred would have been the full bond amount, or $786,892.00; and, that would have been the Surety's maximum exposure.

{¶37} The Court finds that had a proper investigation been done the Surety would have determined its least exposure would have been to pay the full bond amount of $786,892. Had it paid the bond amount it would have been released of responsibility on the project without further loss. It would then have its remedy to recover against its principal, Jutte. The damages the Surety incurred were a direct and proximate cause of its negligence in failing to properly investigate the project alternatives.

## IV: Jutte and its Capacity to Sue

{¶38} OSFC raised the issue of whether or not the Surety has the legal capacity to sue on behalf of Jutte, a bankrupt company. Pursuant to R.C. 1701.88, Jutte is legally permitted to pursue its claim against OSFC.

{¶39} R.C. 1701.88(A) states that a corporation shall continue to exist for purposes of bringing claims "for a period of five years from the dissolution, expiration, or cancellation."

{¶40} R.C. 1701.88(B) states in pertinent part:

{¶41} "The voluntary dissolution of a corporation, cancellation of the articles of incorporation * * * shall not eliminate or impair any remedy to * * * its directors, officers, or shareholders for any right or claim existing * * * prior to the dissolution."

{¶42} Pursuant to R.C. 1701.88(C),

{¶43} "Any claim * * * pending by * * * the corporation * * * may be prosecuted to judgment, with the right of appeal as in other cases * * * the corporation shall, solely for the purpose of such action, suit or proceeding [filed pursuant to R.C. 1701.88(B)] be continued as a body corporate beyond the five year period and until any judgments * * * are executed, without the necessity for any court order * * *."

{¶44} Therefore, Jutte had the capacity to bring suit against OSFC for its potential claims arising out of the project, even though Jutte stopped doing business upon the filing of the bankruptcy and officially ceased to exist as of December 31, 2012. (Ex. BB). Whether or not the Surety had the right to bring the suit on behalf of Jutte for damages that Jutte incurred based on its contractual relationship with OSFC is not as clear, as explained below.

## V: Surety and its Rights

{¶45} In choosing to file a lawsuit as a co-plaintiff with a company that no longer exists, the Surety must inherently assert certain rights of Jutte on behalf of Jutte. This is due in part to Ken Jutte's apparent disinterest in participating in this litigation based, in part, on his failure to appear as a witness even though he was properly subpoenaed. The claims stem from the underlying contract between Jutte and OSFC, and contract to which the Surety was not a party. Therefore, it is imperative that the Surety either assert its own damages or legally assert the damages on behalf of Jutte.

{¶46} The Court is not clear about exactly whose damages are being asserted in this matter; the Surety's or Jutte's. In fact, it seems even the Surety is unclear who was allegedly damaged by OSFC.[3] The Surety representative, Ray Zetts', testimony conflicted with the position stated by counsel during closing arguments. What is clear is that it is the Surety who paid for everything necessary in order for Jutte to complete the project. It was the Surety who paid Jutte's employees, including employment taxes

---

[3]Counsel for the Surety argues that the damages sought are those of Jutte's and not the Surety.

(except for one employee, Rachel, in Jutte's "home office"). Likewise, the Surety paid all of the temporary manpower agencies who supplied the bulk of the employees who finished the job. The Surety paid the vendors their outstanding balances and continued to pay them through the completion of the project. The Surety argues that it paid much more than it should have to complete the project due to the conduct of OSFC in failing to appropriately manage and schedule the project. Ultimately, it does not matter which entity suffered the damages, because Plaintiffs' have failed to prove by a preponderance of the evidence that the alleged damages were proximately caused by OSFC. What is clear, as stated above, is that the damages ultimately stem from the contractually relationship between Jutte and OSFC. Therefore, the Court must determine if the Surety has the ability to assert Jutte's rights against OSFC.

{¶47} There are two ways that the Surety could properly assert damages on behalf of Jutte: 1) the Surety obtains Jutte's rights by stepping into the shoes of Jutte based on general suretyship law, or 2) a legally binding assignment of Jutte's rights to the Surety.

### Stepping into the Shoes of Jutte

{¶48} It is the position of the Surety, and its counsel, that it stepped into the shoes of Jutte when it took over the site and funded Jutte to complete the work. However, it is not clear that the well-established doctrine of a surety stepping into the shoes of its principal applies to the particular facts of this case. Further, the Court finds that the Surety's characterization of what it means to step into the shoes of Jutte does not comport with the general law of suretyship. In general, a surety steps into the shoes of its principal by way of an equitable right of subrogation. This right entitles the surety to recover from its principal any funds owed to it by the state. This right was, in fact, memorialized in the *General Indemnity Agreement*. (Ex. M). Therefore, there is no question that the Surety's right of subrogation exists. However, the Surety seems to believe that stepping into the shoes gives the Surety something more. The Court is

aware of the fact that in some situations the surety agreement allows a surety to step into the shoes of many parties, including its principal, some third parties (i.e. vendors/subcontractors), and even into the shoes of the owner of the project. However, the Surety has failed to demonstrate that any of the particular facts that give rise to those scenarios exist in this case.

{¶49} Plaintiffs provided no authority (and the Court is not aware of any controlling authority) that states that by virtue of the Surety's decision to fund its bankrupt principal, as opposed to formally taking over the project, it obtains the rights of the principal under the original contract to bring claims against the owner. Rather, the well-established law of suretyship is that the Surety's rights come from the equitable right of subrogation, which is inherently limited. There is a general principle of equitable subrogation that "one cannot acquire by subrogation from another, rights which that person did not have." *Ram Constr. Co., Inc. v. Am. States Ins. Co.,* 749 F.2d 1049, 1055 (3d Cir.1984), quoting *United States v. Munsey Trust Co.,* 332 U.S. at 242, 76 S.Ct. 1599 (1947). Equitable subrogation exists to allocate proceeds of already-established rights, not to create new ones.

{¶50} As further explained below, Jutte failed to give timely notice of its claims, pursuant to Article 8 of the Contract. Therefore, it had no right to bring the claims it asserts in either of its Article 8 claims. Consequently, the Surety has no right to bring said claims.

{¶51} Even if Jutte did have a right to those claims, it had no right to claim some of the damages which the Surety asserts, in particular the overruns the Surety incurred to complete the project. Upon careful review of the Surety's expenditures on the project, the overruns were primarily caused by the Surety's decision to employ temporary employees at substantially higher rates than the Jutte employees. (Ex. J, K, JJ). Under the terms of the original contract, Jutte had no right to use temporary employees at a right higher than the agreed upon hourly rates submitted during the bid

process. Therefore, the Surety, having no greater rights than Jutte, had no right to expend additional funds on labor, in excess of the original contract amount. As explained herein, it also failed to demonstrate that OSFC proximately caused these overruns.

{¶52} The Court finds that there is no evidence to support the position that the Surety obtained any rights of its principal, Jutte, save for its equitable right of subrogation. Therefore, it does not have a right to assert of damages on behalf of Jutte that Jutte could not itself assert.

### Assignment of Jutte's Right to the Surety

{¶53} The contract between Jutte and OSFC specifically prohibits an assignment of Jutte's rights without the consent of OSFC. (Ex. 12). There is no evidence of OSFC's consent to an assignment of Jutte's rights found in the record. There is also no evidence that the bankruptcy court assigned Jutte's rights to the Surety. Plaintiffs argue that this right is found in Ex. H, the September 1, 2011 Agreed Order Authorizing the Debtor to Assume Executory with the State of Ohio, School Facilities Commission. However, upon careful review, this order contains no such assignment of rights, i.e. the order does not specifically give to the Surety the right to file a claim against OSFC on behalf of Jutte. Ex. H merely gives Jutte the right to assume and complete the original contract it had with OSFC (with funding from the Surety). It makes no mention of assigning any of Jutte's rights under the contract with OSFC to the Surety.

{¶54} The Surety also asserts that it obtained Jutte's rights under the MOU (Ex. 310) which it argues incorporates the underlying contract. However, the Court does not agree. The Court finds that the underlying contract was not replaced by the MOU, it was merely supplemented such that payments from OSFC originally made to Jutte under the contract could now be made to the Surety (consistent with the Surety's right of subrogation). The MOU did not change the underlying relationship between Jutte

and OSFC. As with Ex. H, it makes no mention of assigning any of Jutte's rights under the contract to the Surety.

{¶55} The Surety also asserts that Jutte assigned its rights via a General Indemnity Agreement (Ex. M). However, as explained above, this indemnity agreement only affects the relationship between Jutte and the Surety it does not assign any of Jutte's rights under the contract to the Surety.

{¶56} The Court finds that there is no evidence to support the position that the Surety was assigned of Jutte's rights beyond those rights established by its equitable right of subrogation.

## VI: Article 8 Claims

{¶57} There is an issue regarding whether or not the Surety is bound by the Article 8 process. The parties have not provided any authority which makes the rights and responsibilities of the Surety related to an Article 8 claim any clearer. Assuming the Surety did step into the shoes of Jutte, and therefore had all the rights and responsibilities which Jutte had in this project, the Surety and/or Jutte failed to give timely notice of its Article 8 claim. The Surety claims that it is not subject to the Article 8 process. It contends that only contractors are required to give timely notice of their claims and proceed with the Article 8 dispute resolution process. If a contractor on a project for OSFC believes that it has been negatively impacted on the project it must give notice to the State within ten (10) days and substantiate its claim within thirty (30) days. (General Conditions, Ex. 12). This is a non-waivable, statutory mandate. *IPS Elec. Srvs., LLC v. Univ. of Toledo*, 10th Dist. Franklin No. 15AP-207, 2016-Ohio-361.

{¶58} On December 2, 2011, Anne Meyers, sent a letter to OSFC which did not comply with the Article 8 requirements. OSFC replied and asked that she provide additional information to substantiate the claim. On December 30, 2011, Anne Meyers sent a follow up letter to OSFC which appears to be its first certified Article 8 claim. In this letter, the Surety takes issue with the supplementation of Jutte's work by Accurate

Electric.  The Surety claims that OSFC paid Accurate employees excessive hourly rates and equipment charges; and, excessive trenching costs.  It raises a concern about OSFC including a 2% bond premium charge for retaining Accurate.  It also complains about allegedly missing and defective work completed by Accurate, as well as preferential treatment of Accurate over Jutte.  All of these issues relate to matters before the MOU, and therefore, are effectively settled as the parties have agreed to move forward under the new arrangement and Jutte promised to correct the mistakes that occurred prior to the MOU.  Even if this were not the case, the December 30, 2011 Article 8 claim is still late.  Accurate's supplementation work occurred several months prior to this letter.

{¶59} On December 19, 2012, the second Article 8 claim was filed by Ronald Friedberg on behalf of the Surety and Jutte.  This Article 8 claim was clearly late as it was received approximately four months after the project was substantially completed.

**Conclusion**

{¶60} Plaintiffs have failed to prove by a preponderance of the evidence within a reasonable degree of certainty that their damages were proximately caused by OSFC.

{¶61} Even if Jutte was able to prove damages, the Surety failed to prove that it is entitled to any of Jutte's damages, or for that matter any of its own damages.  The Surety made a decision that it could possibly "beat the spread," that is, it could finish the project with Jutte and do so for less than it would have to pay another contractor (i.e. Accurate).  However, it made the decision to fund its principal (who essentially existed in name only), after performing only a cursory investigation into said principal's financial health and the current state of the project.  It then supplemented the vast majority of the labor with temporary manpower at substantially higher hourly rates than the original bid, causing massive cost overruns.  The Surety failed to prove that it was the conduct of OSFC that caused it to use this additional expensive labor.

**{¶62}** Even if Plaintiffs proved that their damages were proximately caused by OSFC, any damages related to the claims listed in the two Article 8 letters were not timely submitted and therefore Plaintiffs have waived their right to receive compensation for alleged losses incurred due to those claims.

**{¶63}** For the above-mentioned reasons, it is recommended that the Court find in favor of Defendant, Ohio School Facilities Commission. Since the third-party claims and counterclaims are based solely upon indemnity, the other claims, damages, and costs should be denied as not supported by the greater weight of the evidence.

**{¶64}** *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
DALE A. CRAWFORD
Referee

cc:

Craig D. Barclay
David A. Beals
William C. Becker
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Debra Jean Horn
Robert N. Guliano
Ronald P. Friedberg
28601 Chagrin Boulevard, Suite 500
Cleveland, Ohio 44122

David M. Rickert
110 North Main Street, Suite 1000
Dayton, Ohio 45402

Bradley J. Barmen
1375 East 9th Street, 16th Floor
Cleveland, Ohio 44114

**Filed December 13, 2016**
**Sent to S.C. Reporter 1/17/17**